COURT OF APPEALS OF VIRGINIA


Present:    Judges Frank, Kelsey and Senior Judge Overton
Argued at Chesapeake, Virginia


VIRGINIA LINEN SERVICE AND
 LIBERTY MUTUAL INSURANCE COMPANY
                                                    MEMORANDUM OPINION[*] BY
v.       Record No. 2616-04-2                         JUDGE ROBERT P. FRANK
                                                         JUNE 7, 2005
JOHN W. WISE, JR. (DECEASED),
 SHANNON WISE, MAKAYLA ELIZABETH WISE,
 JESSICA DIANNE WISE, JOHN MICHAEL WISE AND
 MILTON E. WISE


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Roger L. Williams (John T. Cornett, Jr.; Williams & Lynch, on
        brief), for appellants.

        B. Mayes Marks, Jr. (Marks and Associates, P.C., on brief), for
        appellees John W. Wise, Jr. (Deceased), Shannon Wise, Makayla
        Elizabeth Wise and Jessica Dianne Wise.

        Steven M. Oser for appellees John Michael Wise and Milton E.
        Wise.


        Virginia Linen Service and Liberty Mutual Insurance Company, appellants, contend the

Workers' Compensation Commission erred in finding:  (1) Virginia Code § 65.2-306 did not bar

claimant's recovery; (2) claimant's injury and death arose out of and in the course of his

employment with Virginia Linen Service; (3) the "death presumption" applies; and (4) awarding

benefits under the Workers' Compensation Act.  For the reasons stated, we affirm in part, and

remand in part.


---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

John W. Wise, Jr. (decedent) was employed as a maintenance engineer for Virginia Linen Services (employer). Employer is a laundry facility for hospitals, hotels, and restaurants. Decedent began working for employer in October of 2000, repairing equipment in the plant.

Andrew Snowdy, assistant head engineer for the Petersburg facility, testified that bags of linen are lifted from the washers using a "wheel wash lift." The lift is an I-beam that elevates the bags of wet linen and transports them to the extractor where the water is removed. The lift reaches fifteen feet off the ground and is raised and lowered by two ropes connected to an air solenoid valve. The ropes hang from the ceiling. One rope raises the lift, the other lowers it.

The lift needs periodic adjustments because the cables "have a tendency to stretch over time." In order for the trolleys on the lift to roll on and off, minor adjustments must be made so the lift remains in alignment with the track. The adjustments are made "over 15 feet" off the ground and require a 15/16th inch wrench, a 1 and 1/16th inch wrench, and a roll wedge bar.

When Snowdy first came to the Petersburg facility, he had been instructed on the proper procedure for adjusting the lift. To get to the place of adjustment, one could use a manlift (a rolling platform with a cage on top), a twenty-four foot extension ladder, or one could "ride the beam." "Riding the beam" entails sitting on the beam and "have someone else operate the controls" to raise the rider to the ceiling.

When employees rode the beam, at least two people were needed to make the adjustments. The person making the adjustment would stand on the frame on top of the lift while the second person would operate the controls. One person alone could operate the lift to ascend, but could not descend without assistance. Snowdy testified that one could not ride the beam alone and maintain control. Once the beam reached a certain point, it would be impossible for the rider to stop it from ascending because the rider would lose control of the down cord.

Snowdy and others had ridden the beam until Andrew Steeves, employer's assistant general manager, reprimanded them for doing so in October of 1999, prior to decedent's employment. At that time, employees were also told to use a safety harness when they worked above the ground. After decedent's employment, there were no meetings, no written instructions or signs advising employees not to "ride the beam."

Decedent began working for employer in October of 2000, repairing equipment in the plant. As part of decedent's safety training, he was taught to utilize the manlift and wear a safety harness. To the best of Snowdy's knowledge, decedent was never told not to ride the beam. Snowdy testified he never told decedent the lift was a two-man operation, and he did not instruct decedent that he could lose control of the lift if he rode the beam alone.

On the occasions when Snowdy and decedent adjusted the lift together, they used the manlift and wore safety harnesses. Snowdy had also observed decedent use the manlift for other maintenance duties, such as replacing light bulbs and fan belts. Decedent always used a safety harness. Snowdy never saw decedent "ride the beam," nor did he see any other person "ride the beam" after decedent's employment.

Andrew Steeves instructed decedent that when adjusting the lift, he had to use the manlift or ladder, use the safety harness, and have someone else with him. Yet, Steeves conceded he never specifically told decedent not to ride the beam. Steeves acknowledged no documents indicated one person could not control the lift, nor was decedent told this. Steeves observed decedent on a number of occasions adjusting the lift. Each time decedent complied with the safety instructions. Steeves admonished the maintenance crew in 1999 for riding the beam. Subsequent to that, he saw no employees doing so, nor did he receive any information of that safety violation.

After Steeves' reprimand, Snowdy no longer rode the beam, but told other employees they could ride if they wanted to. Additionally, Samuel Fulke, a maintenance engineer, testified that after the conversation with Steeves, he rode the beam "maybe" more than once and also operated the pull cords while other employees rode the beam. Although supervisors were on the floor while employees rode the beam after 1999, no employee received a reprimand.

During December 2001, decedent worked from 1:30 p.m. to 10:00 or 10:30 p.m. every night. The other four maintenance crew members left at various times, the last leaving at 5:30 p.m., leaving decedent as the only crew member of the evening maintenance crew. Each night before 5:30 p.m., a supervisor would give decedent instructions on what maintenance work needed to be performed that night.

On December 20, 2001, the day of decedent's death, Snowdy was decedent's supervisor. He instructed decedent to perform certain maintenance work. He also told decedent, if he had time, to adjust the lift. Snowdy did not specifically tell decedent not to "ride the beam," because "he assumed he would take the [manlift]."

Later that evening, decedent was found dead in the right hand side of the lift near the controls, not on the left side where the adjustments would be made. His body was straddling the lift. The lift was at the top of the ceiling. Decedent was fatally crushed between the lift and the beam.

The lift cables had not been adjusted. Snowdy found no tools in the immediate area of decedent's body. In fact, the proper tools needed for the adjustment were found in decedent's toolbox approximately fifty to seventy-five feet from the lift. The manlift was located twenty-five feet from the lift. Although decedent wore no safety harness, nor was one located near his body, the harnesses were available to decedent.

At the time of his death, decedent had in his possession a multi tool, a flashlight, two crescent wrenches, a center punch and a screwdriver. Snowdy testified the center punch and screwdriver were not long enough to make the necessary adjustments. The crescent wrenches, if big enough, could make the adjustments. However, decedent was familiar with the proper tools needed.

Snowdy identified decedent's daily work report which decedent submitted on December 20, 2001. The detailed report made no mention of any adjustments to the lift. It was decedent's procedure to put the report on David Grubb's (former plant engineer) desk when "his shift was over."

Samuel Fulke confirmed that he used either a ladder, the manlift, or rode the lift when he adjusted the lift. At all times, a second person accompanied him. He further confirmed that other than the conversation with Steeves, there were neither signs nor written documents prohibiting riding the beam.

David Grubb testified that after the 1999 admonition, he saw no one ride the beam. When decedent became employed with employer, Grubb reviewed safety procedures with decedent. He testified:

> I told him the first thing to do we needed to get up on top to take the cables loose. You gotta use either a ladder or a manlift. I showed him where everything was. Well, he already knew it because he was familiar with the lift. And I told him that we'd have to have the safety harnesses on. Any time you're working over five feet you gotta have a safety harness on. And I showed him -- well, he already knew where the locker where we kept safety equipment. He got the safety equipment on. He took the lift up and helped change the cables and the pulleys.

Grubb also instructed decedent that when he worked "in an area where he could not be seen or heard that he was to have someone with him as a ground man," particularly if he was

working above the ground.  Whenever Grubb saw decedent making adjustments to the lift, decedent wore a safety harness, used the manlift, and had other plant personnel with him.

On December 13, 2001, a week before decedent's fatal accident, Grubb had admonished decedent that his "work had dropped off."  After that, decedent worked much harder.

Grubb acknowledged that nothing in the company safety rules specifically prohibited riding the beam.  A copy of the rules was given to decedent when he was hired.

Stan Ashe, chief of security, who worked the evening shift, would assist decedent from time to time when he worked above the ground.  Ashe never saw decedent work without a safety harness or on the manlift without someone else present.

On the night decedent died, decedent had not asked Ashe for assistance.  Ashe testified that as part of his normal routine, decedent would usually move his truck from the rear of the plant to the front of the building just before his shift was over.  He normally left work between 10:15 and 10:30 p.m.  On December 20, Ashe located decedent's truck, with the keys in it, at the front of the building.

The appellees, as heirs of the decedent, filed their claim for death benefits alleging decedent had suffered a compensable and fatal injury by accident on December 20, 2001.

Appellants defended on the grounds that (1) decedent did not suffer an accident that arose out of and in the course of employment; and (2) decedent's injuries were the result of willful misconduct and therefore the claimants were barred from benefits under Code § 65.2-306.

The deputy commissioner found the claim was not barred by Code § 65.2-306:

> It is clear from the testimony of the witnesses that Steves [sic] instructed a number of employees in 1999 not to ride the beam to adjust the cables.  It is also uncontradicted that Virginia Linen Service did not employ the decedent at that time.  There is some dispute as to whether the decedent was told at the time of hiring that he should not ride the beam, but the Commission finds that the decedent was instructed in how to use the "man lift" and the safety harness.

- 6 -

However, the Commission also finds the claimant's witnesses' testimony credible that employees rode the beam after 1999 and that supervisory personnel did not discipline the individuals for doing so. The Commission also finds that the decedent was never prohibited from riding the beam and that his use of the beam on December 20, 2001 was, at most, negligent. Upon considering the evidence in its entirety, the Commission finds that the defendants have failed to prove by a preponderance of the evidence that the decedent's death was due to his own willful misconduct. Although a verbal warning was given in 1999, before the decedent's hiring, the employer is found to have not uniformly enforced it thereafter or made it known to the decedent.

The full commission agreed with the deputy, finding no willful misconduct, ruling:

Here, the employer failed to prove that there was a known safety rule against riding the beam to make the adjustment. The testimony indicated that on one occasion Steeves admonished two crew members from riding the beam. No meetings, handouts, or postings were made regarding riding the beam. This incident happened before the decedent was even hired, and the evidence demonstrated that he had never been instructed not to ride the beam. While the decedent's actions in riding the beam may have been negligent, proof of negligence, even gross negligence, alone will not support the defense of willful misconduct.

The full commission also concluded the "death presumption" applied and found decedent suffered an injury by accident arising out of and in the course of employment. The commission agreed with the deputy's finding:

Although the decedent's daily work report does not reflect that he was given the assignment of adjusting the cables on the lift on the evening of December 20, 2001, Snowdy testified that he told the decedent to perform the adjustment that night if he had time. The Commission finds that the decedent had in his possession, at the time of his death, the tools he believed were necessary to perform the adjustment, and that he was found in the position that would have allowed him to perform that task if he had, unfortunately, not been killed. As noted above, the decedent was negligent in selecting the method to perform the task.

As a result, the Commission finds that the decedent's death was the result of a compensable accident that arose out of and in the course of his employment.

The full commission concluded:

> Here, the "only rational inference to be drawn" from the evidence is that the decedent's death was the result of his employment. The witnesses testified that although the decedent might not have had the tools usually used to perform the work on the lift, he could perform the adjustments with the tools found on his person after his death. The witnesses also testified that riding the beam usually took two people, but it could be done with one person, and the way in which the claimant was found, with the cable tucked under him, indicates that he was operating the lift on his own. The decedent's supervisor, Mr. Snowdy, instructed him to adjust the lift that night. The decedent was found straddling the lift and carrying tools. He had recently been reprimanded for failing to get all of his work done. His truck was parked out front with the keys inside in anticipation of his leaving for the night. All of these facts lead to the rational conclusion that the decedent was attempting to adjust the lift before he left for the night.

This appeal followed.

## ANALYSIS

Appellants first contend that the commission erred in finding decedent's claims were not barred by Code § 65.2-306, which provides in relevant part:

> A. No compensation shall be awarded to the employee or his dependents for an injury or death caused by:
>
> 1. The employee's willful misconduct or intentional self-inflicted injury;
>
> 2. The employee's attempt to injure another;
>
> 3. The employee's intoxication;
>
> 4. The employee's willful failure or refusal to use a safety appliance or perform a duty required by statute;
>
> 5. The employee's willful breach of any reasonable rule or regulation adopted by the employer and brought, prior to the accident, to the knowledge of the employee; or
>
> 6. The employee's use of a nonprescribed controlled substance identified as such in Chapter 34 (§ 54.1-3400 *et seq.*) of Title 54.1.

- 8 -

Appellants argue the commission could have found the claim was barred pursuant to either subsection (1), (4), or (5). Appellants contend that the decedent violated three known safety rules: riding the beam; failure to wear a harness; and working without a second man present. The commission found that there was no known safety rule in place prohibiting "riding the beam." Thus, the commission determined decedent's claim is not barred.

Under Virginia law, an employee cannot receive compensation under the Workers' Compensation Act when his or her injury is the result of either willful misconduct or willful breach of a rule or regulation adopted by the employer. Code § 65.2-306(A); see also Dan River, Inc. v. Giggetts, 34 Va. App. 297, 302, 541 S.E.2d 294, 297 (2001). To establish this defense, the employer must prove: (1) the rule was reasonable; (2) the employee knew of the rule; (3) the rule was for the employee's benefit; and (4) the employee intentionally performed the forbidden act. Buzzo v. Woolridge Trucking, 17 Va. App. 327, 332, 437 S.E.2d 205, 208 (1993). Proof of negligence, even gross negligence, alone will not support the defense, for willful misconduct "'"imports something more than a mere exercise of the will in doing the act. It imports a wrongful intention."'" Id. (quoting Uninsured Employer's Fund v. Keppel, 1 Va. App. 162, 164, 335 S.E.2d 851, 852 (1985) (quoting King v. Empire Collieries Co., 148 Va. 585, 590, 139 S.E. 478, 479 (1927))).

The employer need not establish that the employee, with the rule in mind, purposefully determined to break the rule. Spruill v. C.W. Wright Constr. Co., 8 Va. App. 330, 334, 381 S.E.2d 359, 361 (1989). It is sufficient to show that, knowing the safety rule, the employee intentionally performed the forbidden act. Id. The question whether an employee was guilty of willful misconduct is a question of fact. Id. at 333, 381 S.E.2d at 360.

Appellants' argument is based on the erroneous premise that a rule against riding the beam existed during the time of claimant's employment. To the contrary, the commission found

that employer "failed to prove that there was a known safety rule against riding the beam to make the adjustment." We find evidence in the record to support the decision of the commission.

"On appeal, we view the evidence in the light most favorable to the party prevailing below." Tomes v. James City Fire, 39 Va. App. 424, 429, 573 S.E.2d 312, 315 (2002). "If supported by credible evidence, the factual findings of the commission are binding on appeal." Id. at 430, 573 S.E.2d at 315 (citing Code § 65.2-706(A)). This is so "even though there is evidence in the record to support a contrary finding." Morris v. Badger Powhatan/Figgie Int'l, Inc., 3 Va. App. 276, 279, 348 S.E.2d 876, 877 (1986). "In determining whether credible evidence exists, the appellate court does not retry the facts, reweigh the preponderance of the evidence, or make its own determination of the credibility of the witnesses." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991).

The evidence here shows that other employees of Virginia Linen had ridden the beam prior to claimant's employment. After claimant's employment, there were no meetings and no written instructions or signs advising employees not to ride the beam. Snowdy testified that, to the best of his knowledge, decedent was never told not to ride the beam, and was never told that riding the beam alone would be dangerous. The company rules that were given to decedent upon hiring did not specifically prohibit riding the beam. Steeves never specifically told decedent not to ride the beam.

Appellants never contended that the decedent was told not to ride the beam. They argue that the directive to employees to use either the manlift or the ladder implicitly created a prohibition against riding the beam. In consideration of this argument, we cannot say that decedent willfully disobeyed a known safety rule. Thus, we find that the commission did not err

in finding no willful misconduct because appellants failed to prove that there was a known safety rule against riding the beam to make the adjustment.

Appellants also argue on appeal, as they did below, that the decedent's failure to wear a safety harness and failure to have another employee present bar his recovery under Code § 65.2-306. We note that neither the deputy nor the full commission specifically referred to either of these issues in their legal analyses. While both the deputy and the full commission heard arguments on failure to use safety harnesses and failure to use the buddy system, and each mentioned these issues in their recitations of facts, the full commission ruled only on the broader issue of "willful misconduct" concerning the use of the beam. Because we conclude that this finding is not comprehensive enough to include the two narrower issues, we remand for the full commission to rule on whether failure to use a safety harness and failure to use the buddy system bar recovery under Code § 65.2-306.

Appellants next contend the commission erred in finding that the decedent's fatal injury was compensable. Appellants argue the evidence failed to show decedent suffered the fatal injury by accident that arose out of and in the course of his employment. We disagree.

"To qualify for workers' compensation benefits, an employee's injuries must result from an event 'arising out of' and 'in the course of' the employment." Pinkerton's, Inc. v. Helmes, 242 Va. 378, 380, 410 S.E.2d 646, 647 (1991). "The concepts 'arising out of' and 'in the course of' employment are not synonymous and both conditions must be proved before compensation will be awarded." PYA/Monarch & Reliance Ins. Co. v. Harris, 22 Va. App. 215, 221, 468 S.E.2d 688, 691 (1996) (quoting Marketing Profiles, Inc. v. Hill, 17 Va. App. 431, 433, 437 S.E.2d 727, 729 (1993) (*en banc*)). The claimant must prove these elements by a preponderance of the evidence. Id.

In proving the "arising out of" prong of the compensability test, a claimant has the burden of showing that "'there is apparent to the rational mind upon consideration of all the circumstances a causal connection between the conditions under which the work is required to be performed and the resulting injury.'" Marketing Profiles, 17 Va. App. at 434, 437 S.E.2d at 729 (quoting Bradshaw v. Aronovitch, 170 Va. 329, 335, 196 S.E. 684, 686 (1938)).

> "[I]f the injury can be seen to have followed as a natural incident of the work and to have been contemplated by a reasonable person familiar with the whole situation as a result of the exposure occasioned by the nature of the employment, then it arises 'out of' the employment. But [the arising out of test] excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workmen would have been equally exposed apart from the employment."

Grove v. Allied Signal, Inc., 15 Va. App. 17, 19-20, 421 S.E.2d 32, 34 (1992) (quoting R & T Investments, Ltd. v. Johns, 228 Va. 249, 252-53, 321 S.E.2d 287, 289 (1984)). An accident occurs in the "course of employment" when it takes place within the period of employment, at a place where the employee may be reasonably expected to be, and while he is reasonably fulfilling the duties of his employment or is doing something which is reasonably incidental thereto. Conner v. Bragg, 203 Va. 204, 208, 123 S.E.2d 393, 396 (1962) (citations omitted).

Whether an accidental injury arose out of and in the course of employment is a mixed question of law and fact and is properly reviewable on appeal. See Classic Floors, Inc. v. Guy, 9 Va. App. 90, 383 S.E.2d 761 (1989); Park Oil Co. v. Parham, 1 Va. App. 166, 336 S.E.2d 531 (1985).

Appellants argue that it is unclear what exactly the decedent was doing on the lift when he suffered his fatal injury. The daily work report contained no mention of having adjusted the lift, and he did not have the necessary tools with him to perform such an adjustment.

- 12 -

The commission agreed with claimant's theory that decedent rode the beam at the end of the day in an effort to complete all of his assigned tasks and to impress his supervisor. We find evidence in the record to support this conclusion and will not disturb the commission's finding on appeal.

Decedent was fatally injured while "riding the beam," one of three methods used by employees to adjust the wheel wash lift. The I-beam was positioned where it should have been to make an adjustment, and the decedent possessed wrenches that could make the adjustments. On the night of his death, decedent's supervisor told him to adjust the lift if he had time. The evidence supports the conclusion that decedent was in a hurry, had turned in his daily work report, and had already moved his truck in preparation to leave for the evening. Remembering that he was asked to adjust the lift, he went back to perform this task in an effort to impress his supervisor. Decedent chose to ride the beam, a three-minute endeavor, rather than use the manlift, which would take thirty minutes. Decedent suffered his fatal injury while he was attempting to adjust the lift. We agree with the commission that the only rational inference to be drawn from the evidence is that the decedent's death was the result of his employment.

Finally, appellants contend the commissioner erred in applying the death presumption to this case. Because we find there is sufficient evidence in the record to support the commission's finding that decedent's fatal injury arose out of and in the course of his employment, we need not address this issue.

For the foregoing reasons, the decision of the commission is affirmed as to its ruling that the decedent did not disobey a known safety rule by riding the beam. As to whether the accident arose out of and occurred in the course of the employment, we affirm. We remand for a determination of whether failure to use a safety harness and failing to use the buddy system bar

recovery under Code § 65.2-306.  Because we remand for a resolution of these issues, we reverse the award of benefits.

<u>Affirmed in part,</u>
<u>reversed and remanded</u>
<u>in part.</u>